14126

HORNE v. ATLANTIC COAST LINE R. CO. *ET AL.*

(181 S. E., 642)

462

*Messrs. McEachern & Townsend,* for appellant,

*Mr. F. L. Willcox,* for respondent,

August 13, 1935.

The opinion of the Court was delivered by MR. JUSTICE FISHBURNE.

Reversing the usual order somewhat, we first state the testimony in this case, which is here upon appeal from an order of nonsuit.

On March 15, 1934, I. L. Ford, a section foreman of the defendant, Atlantic Coast Line Railroad Company, and three Negro section hands, returned from their work about 4 o'clock in the afternoon to their homes at Pine Island, a station on the main line of defendant's realroad between Conway, S. C., and Myrtle Beach, S. C. They rode upon a motorcar to which was attached what is described as a small flat car or push car, upon which had been placed six or eight old cross-ties taken from the roadbed in connection with their work. Upon reaching Pine Island station, the motorcar was detached, lifted from the rails, and placed in the tool house. I. L. Ford then opened the switch leading from the main line to a pass track, and the push car loaded with the cross-ties was pushed on to the pass track by the Negroes for a distance of approximately 225 feet, where it came to rest against a flat car upon which logs were to be loaded. Before reaching this station, Ford saw the regular freight train of the defendant railroad approaching from Conway, running on its regular schedule. When first seen by him it was about six miles away, and the motorcar and the push car were moved in order that the oncoming freight train might have a clear and unobstructed passage on the main line.

A portion of Ford's testimony, describing his acts and conduct at the switch, follows:

"Q. After the car (push car) went in there did anything happen to you? A. No, sir; any more than Mr. Miller come up when I turned the switch back—when I rolled the car in —when the men rolled the car in, I throwed this switch back is my recollection of it, and Mr. Miller, a man loading piles there for a logging company called to me—and it was a switch that didn't turn around—just an old ball on it and you throw it over. I had it to fit tight with the main line. When I picked the ball up and throwed it back—and there was some latches that holds it—them latches fails to catch it, is my recollection of it. * * *

"Q. When you threw the ball back, what happened when you threw the ball back? A. He called to me and asked me had I seen Mr. Huggins, his foreman, and I told him 'no.'

"Q. Did you step back for any distance to talk to him? A. I stepped and turned to him, about as far as from here to the Judge—I stepped it—not over two steps.

"Q. What happened while you were talking to him? How long were you talking to him? A. Not over four or five minutes.

"Q. What happened while you were talking to him or as you concluded your conversation with him? A. The train come and went in the sidetrack.

"Q. When you threw the ball back or the switch lever, did you look and see whether or not it had caught and the switch closed? A. No, sir; I considered it closed. I wouldn't leave it open for anything.

"Q. You didn't look at it after you threw it back? A. No, sir.

"Q. You say the switch is constructed how? A. When you throw the ball over there is two little levers that catches the lever that goes into the ball—sometimes these little levers will fail to catch, and if that switch is tight—

"Q. I want to know how the ball part of it is constructed to open and close the switch? How does it work? A. Pick it up and throw it over.

"Q. Has it any weight on it? A. Just a ball about fifteen or twenty pounds.

"Q. To open it you pick it up and turn it over in a half-circle? A. Yes, sir.

"Q. To close it you turn it back a half-circle? A. Yes, sir.

"Q. Latches on both sides? A. Yes, sir.

"Q. Where you turn it over one way and turn it over the other way? A. Yes, sir.

"Q. What signal arrangement is it on that switch? A. When you open the switch it automatically turns a red board.

"Q. Explain how that red board is constructed? A. There is two sides of the board—one red and the other green. The switch is closed when it shows green. When it is open it shows red.

"Q. How big is that target, approximately? A. That one is something about that long (indicating about a foot and a half).

"Q. That square? A. No, sir; that long.

"Q. How wide would you say? A. Six or eight inches.

"Q. When the switch is open that target shows red to the main line? A. Yes, sir; you can't open it without it showing red.

"Q. When it is closed it is green to the main line? A. Yes, sir.

"Q. What was the condition of that target on this day with reference to its point and visibility? A. Good.

"Q. Did you make any measurements to see how far down that railroad track a person could stand and see that target plainly and discern the colors on it? A. Yes, sir."

He further testified that the engineer of the freight train, the defendant Bowie, should have seen, or could have seen, the red switchboard for a distance of 700 feet from the switch; and further that he had known switches of this type to be defective.

And so, with the switch open at his feet, the scene was set for the impending tragedy. The freight train came thundering along at a speed of about twenty miles an hour, en-

tered the open switch, and collided with the push car, killing Joe Ford, the five-year-old son of the beneficiaries, I. L. Ford and Dannie Ivey Ford. The evidence shows that the child had climbed upon the push car about the time the switch was opened, or shortly prior thereto.

There is no specification in the complaint charging the railroad company with maintaining a defective switch. Testimony on this point must be disregarded; it was duly objected to, and the objection was properly sustained.

In his cross examination, Mr. Ford testified that about the time he opened the switch, or immediately prior thereto, he saw his infant son, Joe Ford, crossing toward the push car. Mr. Ford was the particular employee of the railroad company charged with the duty of having this particular switch in such condition that the freight train could pass in safety on the main line on its way to Myrtle Beach; it was his special duty to close the switch after he had opened it. If he had looked at any time between the instant of opening the switch and the instant the train entered it, he could easily have seen that it was open.

This action was commenced in the Court of Common Pleas for Florence County by Maude Ford Horne, as administratrix of the estate of Joe Ford, deceased, on behalf of I. L. Ford and Mrs. Dannie Ivey Ford, the parents of the deceased child, against the Atlantic Coast Line Railroad Company and C. F. Bowie, who was the engineer in charge of the defendant's freight train, for damages, actual and punitive, in the sum of $50,000.00, for the alleged wrongful death of Joe Ford. The complaint contains allegations of various acts of negligence on the part of the defendant, based upon the following delicts: Failure to regard a signal board or target, after opportunity to observe it, in time to avoid the accident; failure to keep the proper lookout; defective brakes; failure to stop the freight train after observing plaintiff's intestate; and a general allegation of reckless inattention to road and track.

The answer contains a denial of the material allegations of the complaint, and sets up as a defense contributory negligence and gross and willful contributory negligence on the part of the parents of the child.

The cause came on for trial on November 7, 1934, before his Honor, Judge C. C. Featherstone, and a jury, and resulted in a nonsuit on the motion of the defendants.

The plaintiff has appealed to this Court upon seven exceptions, assigning error to the Circuit Judge on account of the granting of the nonsuit.

The motion by the defendants for a nonsuit was based upon three grounds: (a) That it appeared from the testimony introduced on behalf of plaintiff that the father, one of the beneficiaries named in the complaint, was proximately responsible for the fact that the switch was open; (b) that the mother was in charge of the child, charged with the duty of keeping him out of a position of danger, and therefore was negligent in permitting the child to be on a railroad track, and on a push car standing on the track at the time of the injury; and that but for the negligence of each there would have been no injury; and (c) on the additional ground that it appeared from their own testimony that both beneficiaries contributed to the injury, and that they, being the only beneficiaries plaintiff as administratrix was not eneitled to recover.

The motion was granted on the grounds that: (a) The proximate cause, that which set in operation the trend of events which resulted in the death of the child, was the failure of the father to properly manipulate the switch; and (b) "it was carelessness on the part of both father and mother, and looking at it from a broad standpoint, if they had done their duty, that child would not have been killed."

It has been held that if a parent fails to exercise reasonable or ordinary care in the control, management, direction, or protection of a child *non sui juris*, and such want of care, whether by acts of omission or commission, directly contributes to the injury of the child by others, such contribu-

tory negligence on the part of the parent will be a defense to an action by the parent against the persons causing the injury, where the action is not for the benefit of the child, but for the parent. But to have this effect the negligence of the parent must be the proximate cause of the injury and the negligence of the defendant must not be wanton or willful. If the injury was avoidable, notwithstanding the contributory negligence of the parent, the action will lie. *Sandel v. State,* 115 S. C., 168, 104 S. E., 567, 571, 13 A. L. R., 1268; *Cirosky v. Smathers,* 128 S. C., 358, 122 S. E., 864, 865; *Wilson v. Clarendon County,* 139 S. C., 333, 138 S. E., 33; *Crawford v. Simons-Mayrant Co.,* 141 S. C., 333, 139 S. E., 788; *Mason v. Southern Ry. Co.,* 58 S. C., 70, 36 S. E., 440, 53 L. R. A., 913, 79 Am. St. Rep., 826.

It was said in *Sandel v. State, supra,* that the contributory negligence of the parents or their agents is a good defense, because in reason they cannot hold defendant liable to them for the consequences of their own negligence. No one is allowed to take advantage of his own wrong, citing *Berger v. Railway, etc., Co.,* 93 S. C., 372, 76 S. E., 1096; *Kilpatrick v. Spartanburg,* 101 S. C., 334, 85 S. E., 775.

The underlying principle in the whole matter is that no one shall profit by his own negligence, and, to allow the father, who had been guilty of negligence, to recover, notwithstanding that negligence, when he brings the suit as administrator, or through some one else as administrator, although he could not do so in his own right, would be to defeat this underlying principle by a mere change of form, when in either event he would benefit by the recovery.

It was in the case of *Cirosky v. Smathers, supra,* that Mr. Justice Cothran, who wrote the opinion, remarked: "The interesting question of the effect of the contributory negligence of one of the beneficiaries upon a recovery by the others does not arise in this case under the allegation of joint negligence of the parents, and has not been considered."

However, a situation exactly contrary to this appears in the instant case, where the parents are charged, separately

and individually, with negligence. The point, therefore, logically arises, and should be passed upon; especially in view of the fact that the same question was passed over and not decided, because not specifically raised, in the case of *Wilson v. Clarendon County, supra;* and in further view of the fact that this case must be resubmitted to the jury, and this question may then arise.

Also in *Cirosky v. Smathers, supra,* the statement is made: "Nor has the question of the effect of the ordinary contributory negligence of the beneficiaries upon the cause of action based upon willfulness and recklessness arisen or been considered."

We shall also find it necessary to dispose of this point.

We will first discuss whether the facts and circumstances as related here preclude the father, I. L. Ford, from recovering upon the ground of his alleged negligence, recklessness, or gross negligence contributing as a direct or proximate cause of the damage, and without which it would not have occurred.

"Contributory negligence is a want of ordinary care upon the part of a person injured by the actionable negligence of another, combining and concurring with that negligence, and contributing to the injury as a proximate cause thereof, without which the injury would not have occurred." *Easler v. Railway Co.,* 59 S. C., 311, 37 S. E., 938, 941.

The determination of this question of "proximate cause" is one ordinarily for the jury, and is decided by the Court only when the evidence is susceptible of only one rational inference.

Mr. Justice Watts, in the case of *Miller v. Atlantic C. L. Railroad Co.,* 140 S. C., 123, 138 S. E., 675, 689, quotes the following from *State v. DesChamps,* 126 S. C., 416, 421, 120 S. E., 491:

" 'The proximate cause of an injury is that cause which, in natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury, and without which the result would not have occurred.' 22 R. C. L., 110, § 2.

The efficient 'intervening cause must be one, not produced by the wrongful act or omission, but independent of it, and adequate to bring injurious results.' *Mack v. Railroad Co.*, 52 S. C. [323], 336, 29 S. E. [905], 910, 40 L. R. A., 679, 68 Am. St. Rep., 913; *Cooper v. Richland County,* 76 S. C., 202, 56 S. E., 958, 10 L. R. A. (N. S.), 799, 121 Am. St. Rep., 946. Any cause intervening between the first wrongful cause and the final injury, which might reasonably have been foreseen or anticipated by the original wrongdoer, is not such efficient intervening cause as will relieve the original wrong of its character in law as the 'proximate cause' of the final injury. *Harrison v. Berkeley*, 1 Strob., 525, 549 [47 Am. Dec., 578]; *Cooper v. Richland County, supra;* 22 R. C. L., 134, § 19. * * *

"In *Sandel v. State,* 115 S. C. [168], 180, 104 S. E., 567, 571, 13 A. L. R., 1268, Mr. Justice Hydrick says: 'But, in application, the rule may need explanation; for instance, it is not necessary to show that a person charged with negligence should have foreseen the particular consequences or injury that resulted. It is enough that he should have foreseen that his negligence would probably result in injury of some kind to some one.' "

"The difference between intervening and concurring causes appears to have been overlooked. In operation an intervening cause succeeds or follows that which, for convenience, is called the primary cause, though, as we have seen, it is only the remote cause; but concurring causes operate contemporaneously to produce the injury, so that it would not have happened in the absence of either. If, by the exercise of reasonable foresight and diligence, a concurring cause should have been foreseen and foreguarded, of course liability for it attaches. But the mere fact that one of several concurring causes may not have been reasonably anticipated is not enough to shield from liability him who sets in motion the other; for it is well settled that the negligence complained of need not be the sole cause of the injury. It is enough to show that it is a proximate concurring cause; that is, one

that was so efficient in causation that, but for it, the injury would not have occurred. 22 R. C. L., 128." *Sandel v. State, supra.*

On this point we also find the following rule in 45 Corpus Juris, 918, § 484: "Anticipation of particular injury. Where an act or omission is negligent, it is not necessary to render it the proximate cause that the person committing it could or might have foreseen the particular consequence or precise form of the injury, or the particular manner in which it occurred, or that it would occur to the particular person, if by the exercise of reasonable care it might have been foreseen or anticipated that some injury might result. As otherwise stated, it is sufficient that the consequence attributable to the negligent act or omission was the natural and probable resul thereof, although it might not have been specifically contemplated or anticipated."

Keeping in mind the testimony in this case, as it bears upon the actions and conduct of Ford, we think it perfectly clear, under the authorities cited, that the acts of the section foreman, the father of the deceased and one of the beneficiaries, contributed directly and proximately to the death of the child, without which it would not have occurred; and not only amounted to negligence, but constituted gross contributory negligence and recklessness. No other inference can be reasonably indulged. Under the principles of law applicable here, I. L. Ford should be barred of recovery.

It is alleged in the complaint that the acts of the defendants not only constitute negligence, but in addition thereto carelessness, willfulness, wantonness, and recklessness. If Ford had been merely negligent, then his contributory negligence under the authorities would not defeat recovery by him if the defendant's acts were willful and wanton; but if we assume for the sake of argument that the alleged acts of the defendants were such as to constitute a basis for punitive damages, this would not in any way avail Mr. Ford.

It was held in *Osteen v. Atlantic C. L. Railroad Co.,* 119 S. C., 438, 112 S. E., 352, that gross, willful, or wanton contributory negligence defeats recovery for negligence of the same character.

The same point was decided in *Spillers v. Griffin,* 109 S. C., 78, 95 S. E., 133, 134, L. R. A., 1918-D, 1193 where Mr. Justice Fraser, who wrote the opinion of the Court, stated: "Again contributory negligence is not a defense to willfulness, because the parties are not equally to blame. Apply that same rule here, and we find that when a plaintiff willfully contributes, as the proximate cause to his own injury, he cannot recover, even though the defendant was willful. If the parties were equally, in the same class, to blame in producing the injury, neither can recover."

See, also, *Cable Piano Co. v. Southern Railway,* 94 S. C., 143, 77 S. E., 865.

■ We now proceed to pass upon the question: Does the contributory negligence of the father, one of the beneficiaries, bar recovery by the mother, the other beneficiary?

This question must be answered in the negative. The sounder reason and the greater weight of authority support a contrary holding.

The negligence of one parent cannot, according to the great weight of authorities, be imputed to the other parent so as to bar the action by the latter for his or her benefit, or as administrator, for the wrongful death of a child.

In a most comprehensive monographic note appended to the case of *Town of Flagstaff v. Gomez,* reported in 23 A. L. R., 661, we find the following:

"The rule supported by the majority of the cases appears to be that the contributory negligence of a parent, even though it may bar recovery for his benefit, or to the extent of his interest, in an action by the administrator for the death of a child, will not altogether defeat recovery, if there are other beneficiaries who were not negligent; but that

the amount of the verdict will merely be reduced to the extent of the negligent parent's share. This question is closely connected with the question whether the contributory negligence of one parent will be imputed to the other, so as to bar recovery for the death of a child by or for the benefit of the latter, since generally the other beneficiary is the other parent, who was not directly negligent. It seems, therefore, advisable to treat these two questions together. However, assuming that the contributory negligence of a parent will bar a recovery by an administrator of a child *non sui juris*—at least, to the extent that the negligent parent would be entitled to share in the recovery—the question whether the father is chargeable with the negligence of the mother, or *vice versa,* would seem to depend upon the same principles that would apply if the action were by the father or mother for loss of services for personal injuries not resulting in the death of the child. This question, therefore, cannot be fully treated in this annotation, though the holdings of the Courts on the point, in the cases that fall within the scope of the annotation, are here set out.

"In accord with the above rule that the contributory negligence of a parent will defeat recovery for death of a child, in an action by the administrator, only to the extent of such parent's interest, is the rule which is supported by the majority of the cases on facts within the scope of the present annotation, that the contributory negligence of one parent will not be imputed to the other so as to bar recovery, merely on that ground, for death of a child, by or for the benefit of the latter. The following cases, some of which also discuss the question from the broader standpoint of the effect of one beneficiary's contributory negligence upon the rights of the other beneficiaries, support what seems to be the better view, that the negligence of one parent is not imputable to the other, so as to preclude recovery, merely for that reason, by or on behalf of the parent who is not negligent, for the death of a child:" (Here are cited many cases, too numerous to refer to, in support of this holding.)

"* * * Yet the cases are practically uniform in holding that the negligence of one parent contributing to the death of a child is not to be imputed to the other parent, so as to destroy the right of the latter to recover as a beneficiary of the cause of action for such death, irrespective of whether the action is by the parent or by the personal representative of the child." 8 R. C. L., 786, § 67.

"It has generally been held, however, that the contributory negligence of some of the beneficiaries will not defeat the action as to others not guilty of such negligence, although the rule does not prevail in all jurisdictions, and it has sometimes been held that recovery should be denied to the extent that it would inure for the benefit of those guilty of contributory negligence." 17 C. J., 1245.

Did the alleged negligence or gross contributory negligence of the mother directly, proximately cause the death of the child, without which it would not have occurred?

The testimony shows that Mrs. Dannie Ivey Ford, one of the beneficiaries for whom this suit was brought, was the mother of five children, Joe Ford, the deceased, being the youngest; she lived with her husband, I. L. Ford, and her children, in the house provided by the railroad company for its section foreman, located within 30 or 40 feet of the railroad track, and within approximately 175 feet of where the child was killed.

She knew that the Jackson Lumber Company was at the time engaged in loading piles for a lumber company on railroad cars on the siding at Pine Island Station, and that this particular sidetrack was used for switching cars almost daily, and she knew that freight trains and passenger trains passed along on this track daily on their regular schedules. The family had been living in this house three or four months, and at the time of the accident Mrs. Ford was engaged in sewing. She heard the motorcar and the push car arrive, bringing her husband and the section hands; heard the motorcar being placed in the tool house. During this time the

little boy, Joe Ford, had come into the house and had spoken to her and her daughter, and then gone out. Hearing the approach of the freight train, Mrs. Ford and her daughter went to the door to observe the passing of the train on the main line. Her daughter was standing in front of her at the time of the accident, and Mrs. Ford did not know that the child had been killed until told so by her daughter. She further testified that she did not worry about the little boy when her husband and the hands were there, because they would look out for him.

Upon a consideration of this testimony and upon the entire record, we are unable to say as a matter of law that Mrs. Ford should be charged with contributory negligence as a proximate cause.

The last question to be passed upon is: Was there sufficient evidence of negligence on the part of the defendants to submit this issue to the jury?

It must be conceded that Joe Ford, the decedent, was a trespasser upon the property of the defendant railroad company, and they owed him no duty except not to willfully or wantonly injure him. *Darwin v. R. R. Co.*, 23 S. C., 531, 540, 55 Am. Rep., 32; *Smalley v. Southern Ry. Co.*, 57 S. C., 243, 35 S. E., 489.

This being an appeal from an order of nonsuit, the evidence, and all inferences from it, must be considered most favorably for the plaintiff, and must be interpreted most strongly against the defendants. *Sturdyvin v. Atlantic & C. Air Line R. Co.*, 98 S. C., 125, 82 S. E., 275.

I. L. Ford testified that the freight train approached Pine Island Station from Conway on a right-hand curve, that the curve ended at the switch target, and that the side track is located on the right of the main line. That the engineer, Bowie, was located on the right side of the engine, which placed him on the inner side of the curve, and that he had a clear and unobstructed view of the switch target for a distance of 700 feet, and upon entering the open

switch had a clear and unobstructed view of the push car, 225 feet distant therefrom, there being no woods or undergrowth to obstruct his vision, but that he (Ford) did not see the child on the push car because he did not look in that direction after he opened the switch.

Mrs. Dannie Ivey Ford stated in her testimony that the engineer jumped from the engine of the freight train after it entered the side track, about midway between the switch and the push car.

In her testimony, Mrs. Clara Bass, a married daughter of the Fords, stated that she stood in the front porch of the Ford house, which was located right opposite the switch, and 30 or 40 feet distant therefrom, and saw the child on the push car sitting on top of the ties, immediately before the collision; that the Negro hands were standing around or leaning against the push car, "and the train was on them before they realized, and they got off the best way they could."

The testimony presents issues which must be decided by a jury, and in view of the fact that there must be a new trial it would not be proper for us to suggest inferences which might be deducible from the testimony.

In the case of *Mason v. Southern Railway Co.*, 58 S. C., 70, 36 S. E., 440, 444, 53 L. R. A., 913, 79 Am. St. Rep., 826, the Court said: "The question whether a railroad company owes any duty to an infant trespassing upon its track, until it discovers the infant, has given rise to much discussion, and the authorities upon this subject are in irreconcilable conflict. Even conceding that a railroad company is not bound, as a general proposition, to look out for trespassers upon its track, it nevertheless is bound to exercise ordinary care in running its trains. The law imposes upon it the duty of keeping a reasonable lookout for obstructions on its track. The safety of its passengers and the rights of the public generally demand the enforcement of this rule. It is a general rule of law that a railroad company is liable in damages for an injury inflicted by it, when its negligence

was the direct and proximate cause of the injury. If the direct and proximate cause of the infant's death was negligence of the defendant in failing to keep a reasonable lookout, and to discover the child in time to have prevented the injury, it is as much liable in damages as if the proximate cause of the injury had been its negligence after discovering the child upon its track. *Bottoms v. R. R. Co.* [114 N. C., 699], 19 S. E., 730, 25 L. R. A., 784 [41 Am. St. Rep., 799]; *Gunn v. R. Co.* [42 W. Va., 676], 26 S. E., 546, 36 L. R. A., 575; Wood's Ry. Law, Pages 1275-1280."

In *Wilson v. Southern Railway*, 93 S. C., 17, 75 S. E., 1014, 1016, Mr. Justice Woods stated in his concurring opinion: "But contributory negligence is not a defense against willfulness or wantonness. The duty of a locomotive engineer and a fireman to keep a vigilant lookout ahead, for the sake of passengers as well as those who may be helpless on the track, is urgent, and the failure to keep a lookout may be evidence of recklessness or wantonness. In this case the night of the fatality was bright, and the locomotive had a powerful electric headlight. There was evidence from which it might be inferred that Wilson was lying on the track asleep or drunk, or that he was crossing the track on his way home, and that the place was one where persons were to be expected crossing the track. The evidence also tended to show that those in charge of the engine did not see Wilson at all, for the train did not slow up or stop. From all this the jury might infer that no lookout was kept, and that this was a reckless disregard of the lives of those who might be on the track even as trespassers. *Sentell v. Southern Ry.*, 70 S. C., 183, 49 S. E., 215. The evidence warrants, also, a rejection of such an inference, but whether the inference should be accepted or rejected was a question for the jury."

In the case of *Tolleson v. Southern Ry.*, 88 S. C., 7, 70 S. E., 311, 313, the principle was announced that: "Not only is the conscious invasion of the rights of another, in a wanton, willful, and reckless manner, an act of wrong, but that the same result follows when the wrongdoer does not ac-

tually realize that he is invading the rights of another, provided the act is committed in such a manner that a person of ordinary reason and prudence would say that it was in reckless disregard of another's rights."

We here repeat a portion of the quotation from *Sandel v. State, supra:* "It is not necessary to show that a person charged with negligence should have foreseen the particular consequences or injury that resulted. It is enough that he should have foreseen that his negligence would probably result in injury of some kind to some one."

We, of course, are not to be understood as expressing or indicating any opinion upon the weight and sufficiency of the testimony. What inferences should be drawn are exclusively for the jury. We merely hold that there was some testimony tending to support plaintiff's case.

All questions raised by the exceptions have been considered and passed upon.

It is the judgment of this Court that the judgment of the Circuit Court stand affirmed insofar as it relates to I. L. Ford, and that as to him the plaintiff be barred of recovery; and that as to Dannie Ivey Ford, the said judgment be reversed.

MR. CHIEF JUSTICE STABLER and MESSRS. JUSTICES CARTER and BONHAM concur.

MR. JUSTICE BAKER (concurring in result): I concur in the result. In my opinion there should be submitted to the jury the question if, under all the circumstances of the case, the defendants failed to exercise slight care, and if this failure on the part of defendants to exercise slight care was the proximate cause of the injury.